UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| B.L.B.,<br><br>               Plaintiff,<br><br>      vs.<br><br>KILOLO KIJAKAZI, ACTING<br>COMMISSIONER OF THE SOCIAL<br>SECURITY ADMINISTRATION;<br><br>               Defendant. | 4:21-CV-04222-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, B.L.B., seeks judicial review of the Commissioner's final

decision denying his application for social security disability benefits under

Title II and Title XVI of the Social Security Act.[1]  Mr. B. has filed a complaint

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits.  Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference—greatly simplified—is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are also calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See, e.g., 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  Mr. B. filed his application for Title II and XVI benefits.  His coverage status for SSD benefits expires on September

and motion to reverse the Commissioner's final decision denying his disability benefits and to remand the matter to the Social Security Administration for further proceedings.  See Docket Nos. 1, 10.  The Commissioner has filed her own motion seeking affirmance of the agency's decision below.  See Docket No. 14.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

**FACTS**[2]

**A.    Procedural History**

This action arises from Mr. B.'s application for Social Security Disability Insurance (SSDI) benefits and Supplemental Security Income (SSI) with a protected filing date of December 27, 2018, alleging disability starting June 15, 2016, due to low back pain and issues with fusion surgery, arthritis and residuals from injuries to both hands and wrists, bilateral shoulder problems with prior surgery to the right shoulder, stomach acid, narrowed esophagus with swallowing difficulties, right elbow recurrent tendonitis, arthritis in mid

---

30, 2018.  AR11, 13.  In other words, in order to be entitled to Title II benefits, Mr. B. must prove disability on or before that date.

[2] These facts are recited from the parties' stipulated statement of facts. See Docket No. 9.  The court has made only minor grammatical and stylistic changes and minor additions.

2

and upper back/neck, asthma, swelling knees, and overwhelming pain. AR182, 189, 236, 256, 260, 264.[3]

Mr. B.'s claims were denied at the initial and reconsideration levels, and Mr. B. requested an administrative hearing.  AR113, 118, 125, 130, 132.

Mr. B.'s administrative law judge ("ALJ") hearing was held on February 18, 2021, where Mr. B. was represented by a non-attorney representative. AR43.  The hearing was conducted by phone due to Covid-19 and lasted 65 minutes.  AR43, 77.  An unfavorable decision was issued March 17, 2021, by the ALJ.  AR7.

The ALJ found that Mr. B.'s date of last insurance ("DLI") was September 30, 2018.  AR11, 13.

At Step One of the evaluation the ALJ found that Mr. B. had engaged in substantial gainful activity from June 15, 2016, the alleged onset of disability date, through June 2017.  AR13.  The ALJ found that the evidence did not reflect substantial gainful activity after June 2017.  AR14.

At Step Two, the ALJ found that Mr. B. had severe impairments of cervical degenerative changes with right C5-C6 disc herniation; thoracic kyphosis; thoracic degenerative changes; lumbar degenerative changes; median neuropathy at the wrist; and asthma.  Id.

The ALJ noted that Mr. B. had also reported shoulder pain, "which might be related to her [sic] cervical and/or thoracic impairments."  Id.  The ALJ

---

[3] Citations to the appeal record will be cited by "AR" followed by the page or pages.

3

found that the evidence did not reflect the presence of any standalone shoulder-related medically determinable impairment.  Id.

The ALJ found that Mr. B. had a medically determinable impairment of dysthymic disorder/depression which was nonsevere.  AR14-15.  The ALJ found that Mr. B.'s mental impairment caused only "minimal" limitations in his ability to perform mental work activities.  Id.  The ALJ found that Mr. B.'s depression caused mild limitations in interacting with others and in his ability to adapt or manage himself.  AR15.

In Step Three, the ALJ found that Mr. B. did not have an impairment that meets or medically equals a listing.  AR16.

The ALJ determined that for the period July 1, 2017 through November 1, 2018, Mr. B. would have an residual functional capacity ("RFC") for a range of light work: he could lift and carry 20 pounds occasionally and 10 pounds frequently, sit about 6 hours in an 8-hour workday, stand and/or walk about 6 hours in an 8-hour workday; frequently climb ramps and stairs, kneel, crouch, and crawl; occasionally climb ladders, ropes, or scaffolds; stoop; and occasionally be exposed to fumes, odors, dusts, and atmospheric conditions.  Id.

The ALJ found that Mr. B.'s statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence and other evidence of record for the reasons explained in the decision.  AR17.

The ALJ stated that she accepted that Mr. B. appeared to have experienced some greater degree of functional limitation from November 2018. AR19. The ALJ stated, however, the record clearly does not support a finding of worsening or determination associated with any impairment, whether considered singly or in combination with any other impairment or impairments, indicative of an inability to reliably sustain a somewhat more reduced range of light level tasks and work as set forth in the residual function capacity at finding seven. Id.

The ALJ determined that for the period of November 1, 2018, through the date of the decision Mr. B. would have an RFC for a reduced range of light work: he could lift and carry 20 pounds occasionally and 10 pounds frequently, sit about 6 hours in an 8-hour workday, stand and/or walk about 4 hours in an 8-hour workday, frequently climb ramps and stairs, and occasionally climb ladders, ropes, or scaffolds. AR18. Mr. B. could rarely stoop, and frequently kneel, crouch, and crawl, only occasionally be exposed to fumes, odors, dusts, and atmospheric conditions. Id. Mr. B. was also limited to frequent handling, fingering, and feeling. Id.

The ALJ found at Step Four that Mr. B. could not perform his past relevant work since June 2017. AR24.

The ALJ found at Step Five, relying on the testimony of a vocational expert ("VE"), that there were other jobs existing in significant numbers in the national economy Mr. B. could perform from July 1, 2017, through November 1, 2018. AR25-26. At the hearing, the ALJ specifically asked the VE whether

the jobs identified by the VE were "available across several regions, of the country."  The VE replied the jobs were.  AR76.

The ALJ found at Step Five in finding seven, relying on the testimony of a VE, that there were other jobs existing in significant numbers in the national economy Mr. B. could perform from November 1, 2018, through the date of the decision.  AR26-27.  The ALJ noted that the VE testified that she had reduced the number of jobs for each of the three occupations identified by 50 percent given "the sit/stand option" set forth in the residual functional capacity at finding seven above.  AR27.  Finding seven in the decision does not contain a "sit/stand option."  AR18.

The ALJ considered the opinions of the State agency medical consultants at the initial level and reconsideration level and noted that the experts concluded there was "insufficient evidence prior to the date last insured."  AR23.  The ALJ stated this was not considered as an opinion.  Id.

The ALJ noted that at the initial level the State agency consultant found Mr. B. able to be in the light range, but never able to perform any postural activities.  Id.  The ALJ stated the postural limitations were overly limiting.  Id.

The ALJ noted that at the reconsideration level the State agency consultant found Mr. B. able to be in the light range but modified the postural limitations.  Id.  The ALJ found this opinion to be consistent with the record "prior to November 2018" and mostly persuasive for that period.  Id.  The ALJ stated, "[i]t is also consistent with the treatment which suggests adequate

6

control with medication." Id.  The ALJ stated however the opinion did not consider the effect of Mr. B.'s asthma and some limitations are accepted around pulmonary irritants.  Id.

The ALJ stated, "[i]n November 2018, the undersigned does find support for additional postural limitations, manipulative, standing and walking limitations particularly with the claimant's back and intermittent reports of hand/arm pain." Id.  The ALJ stated Mr. B. had findings in his lumbar spine necessitating a surgery.  Id.  The ALJ further noted that despite this evidence Mr. B. has maintained a normal gait, sensation, and strength but has been observed to be stiff and walking slowly.  Id.

The ALJ considered the opinions of consultative examiner, Dr. Young, who in July 2019 noted restrictions to a reduced range of sedentary level tasks/jobs with no lifting over 10 pounds, no prolonged standing or walking and difficulties with fine motor movements with the hands and asserted that Dr. Young's own "fairly benign" findings on exam were inconsistent with his opinions and the opinions were unpersuasive.  Id.

The ALJ also noted the record contains a couple of statements from Dr. Tinguely supportive of a finding of disability.  The ALJ asserted that Dr. Tinguely did not provide any work-related limitations, only stating that Mr. B. was no longer able to perform his past work as a brick mason.  In a second statement, Dr. Tinguely concluded that it was in Mr. B.'s best interest to apply for benefits.  The ALJ found that it does not appear that Dr. Tinguely had quantified Mr. B.'s limitations.  AR24.

7

Mr. B. requested review of the ALJ's denial from the Appeals Council and submitted additional evidence including a personal note from Mr. B. (AR297), a September 7, 2021, letter from Mr. B.'s treating physician, Dr. Tinguely, (AR39), and Sanford Health treatment records from April 28, 2021, to May 7, 2021, including a new MRI.  AR179, 295, 632-652.   The Appeals Council denied the request for review on October 25, 2021, making the ALJ's decision the final decision of the Commissioner.  AR1.  The Appeals Council's Notice referenced the new letter from Dr. Tinguely and determined it did not show a reasonable probability of changing the outcome of the decision.  AR2.  The Appeals Council's Order exhibited the personal note Mr. B. had written.  AR5. Neither the Appeals Council's Notice nor Order mentioned the Sanford Health treatment records that included the new MRI.  AR1-5.  Mr. B. timely filed this action.

**B.    Relevant Medical Evidence**

A lumbar MRI obtained on April 28, 2016, showed a left paramedian disk protrusion at L5-S1 with cranial migration without definite spinal stenosis or nerve root impingement, a left paramedian disk protrusion at L4-5 with caudal migration compressing the left L5 nerve root, and a questionable tiny focal right lateral disk protrusion at L4-5 that may abut and irritate the exiting right L4 nerve root.  AR460.

Cervical spine x-rays were obtained on August 28, 2017, due to ongoing left shoulder pain and revealed no acute abnormality.  AR337.

8

Mr. B. was seen by Dr. Tinguely on January 16, 2018, for a medication recheck.  AR308.  Mr. B. was prescribed Norco to be used as needed and was taking it at night due to pain waking him up every hour or so.  Id.  Mr. B. reported he was performing lightweight electrical and plumbing work for "a guy who pays cash only."  He was also taking Proventil aerosol inhaler for wheezing, Meloxicam for joint pain, and Protonix for acid reflux.  Id.  The psychiatric finding was mood "one of pain, pleasant, calm."  AR309.  Mr. B.'s assessments were neck pain, lower back pain, and cigarette smoking.  Id.  Gabapentin/Lyrica was added for his back and neck pain.  Id.

Mr. B. was seen by Dr. Tinguely on February 27, 2018, for follow-up on his chronic pain and reported he was struggling, could only stand for about five minutes at a time with morning being the worst.  AR332.  Mr. B. was taking Norco and Lyrica, but only taking the Lyrica at night because he didn't trust himself to drive if he took it in the morning.  Id.  Mr. B. reported he tried to remain as active as possible—he loves fishing, hunting, and camping.  Id.  Dr. Tinguely noted that Mr. B. did not want injections/epidurals because they didn't work in his shoulders after having so many of them.  Id.

Mr. B. was seen by Dr. Tinguely on June 20, 2018, for a pain medication check for controlled substances.  AR329.  Mr. B. reported "doing pretty well" and the Norco was "working well" for him as he was able to make his sixty tablets last thirty days.  Id.  Mr. B. reported he had a job in Tennessee involving brick work, but he indicated he could handle it.  Id.  Mr. B. reported his Lyrica made him feel drunk and slur his words.  Id.  Mr. B. reported

9

hurting his elbow lifting sheetrock three weeks earlier, but felt it was getting better.  Id.  Dr. Tinguely continued the Norco, and noted that if Mr. B. obtained insurance, it would really open up more options for him.  AR330.  Mr. B.'s assessments included neck, lower back, and elbow joint pain.  Id.

Mr. B. was seen by Dr. Tinguely on August 22, 2018, for chronic neck, back and wrist pain and more acute right elbow pain.  AR326.  Mr. B. had tried a brace for his elbow, but that made it worse.  Id.  Mr. B.'s mood was dysthymic, and he was quite tearful.  AR327.  Mr. B.'s assessment included elbow joint pain.  Id.  Naproxen was recommended for tendonitis in his elbow and Cymbalta prescribed for his mood.  AR328.

Mr. B. was seen by Dr. Tinguely on September 13, 2018, for his chronic neck and hand pain and requesting to be switched to a different antidepressant because he had tried Cymbalta for three weeks and it made him feel like he was in a glass bottle.  AR324.  Mr. B. reported his chronic neck and hand pain didn't seem better but was not worse and he was doing some odd jobs and trying to use as little Norco as possible.  Id.  Mr. B. reported that his right elbow continued to be a problem and naproxen had not helped.  Id.  Mr. B. reported he had been on Wellbutrin ten years earlier and it had worked well for his depression and anxiety.  Id.  Wellbutrin was prescribed for his depression and injections were planned for his elbow.  AR325-26.

Mr. B. was seen by Dr. Tinguely on November 20, 2018, for follow-up on chronic neck, shoulder, and hand pain.  AR321.  Mr. B. reported that the Norco was very helpful in continuing to work around his house, but he could

no longer work as a bricklayer.  AR322.  Mr. B. reported terrible spasms in his hands if he does anything more than an hour like painting.  Id.  His assessments included shoulder pain, neck pain, lower back pain, and arthralgia of hand.  Id.

Mr. B. was seen by Dr. Tinguely on December 19, 2018, for a medication recheck and reported continued chronic neck and back pain with new pain in his mid-back following a fall in the shower.  AR319.  The record indicates that Mr. B. began taking opiate pain medication in June 2016.  AR319.  Mr. B.'s mood was dysthymic, and his assessments were neck pain and upper back pain.  AR320.  Cervical spine x-rays revealed multilevel degenerative disease similar to prior August 24, 2017, x-rays.  AR320, 334.  Thoracic spine x-rays revealed spondylosis with a mild kyphosis.  AR321, 335.

Mr. B. was seen by Dr. Tinguely on May 9, 2019, for follow-up on chronic neck and back pain treated with a small amount of Norco.  AR370.  Mr. B. reported having a hard time with pain control and was taking Norco in the morning, afternoon, and again sometimes at bedtime and also taking naproxen.  Id.  Mr. B. reported investigating insurance options, but could not afford the $400 per month premium, and he was applying for disability.  Id.  Examination revealed motor dysfunction with a very stiff walk, and dysthymic mood.  AR371.  X-rays were obtained of the cervical and lumbar spine.  Id.

Dr. Tinguely submitted a letter on May 20, 2019, regarding Mr. B. in which she stated Mr. B. struggles with pain and weakness in his low back, neck, and elbows.  AR342.  Dr. Tinguely stated that Mr. B.'s earlier MRI

revealed possible nerve root irritation at L5, and a more recent cervical spine x-ray revealed multilevel degeneration.  Id.  Dr. Tinguely stated she would be supportive of his application for disability because he could no longer do brick mason work for which he was trained.  Id.

The State agency ordered a physical consultative exam and Mr. B. was examined by Dr. Young on July 11, 2019.  AR347.  Dr. Young stated Mr. B. reported applying for disability due to chronic neck and back pain, and shoulder pain with a history of left shoulder surgery.  Mr. B. also reported so much pain after the surgery he was unable to work, and he had a house fire and lost his insurance.  Id.  Mr. B. had had no injections or physical therapy due to his lack of insurance.  Id.  Mr. B. reported he was permanently hunched over and could not extend his back but could still do some chores around the house and take care of his dogs.  Id.  Mr. B.'s history also stated he had bilateral carpal tunnel with numbness on his median nerve distribution in both hands with some weakness and clumsiness with fine movements such as using a pen or holding a cup.  Id.  Mr. B. was taking Norco twice a day that helped his function somewhat.  Id.

Examination revealed intact strength and sensation in upper and lower extremities, normal neck range of motion, limited back extension, fixed in a slightly flexed position, and he was able to fully flex with some difficulty.  AR348.  Mr. B.'s gait was normal.  Id.  Hand x-rays revealed mild osteoarthritis without acute bony abnormality.  AR350-351.  Dr. Young assessed chronic neck and back pain secondary to multilevel degenerative disease of the spine

12

and bilateral carpal tunnel disease.  AR348.  Dr. Young stated he had reviewed the x-ray results from Falls Community Health and they were consistent with multilevel degenerative arthritis of the spine.  Id.  Dr. Young stated that examination did show significant deformity in that Mr. B. was hunched over during the entire exam, and Mr. B. did have numbness in the median nerve distribution of both hands, per his report.  Id.  Dr. Young stated, "On exam, the sensation was fairly intact in both, but his symptoms do fit the diagnosis of carpal tunnel."  Id.  Dr. Young commented that it would be difficult to obtain EMGs or surgery that he likely needs to improve the condition without insurance.  Id.

Dr. Young opined that any employment requiring prolonged standing or walking would be difficult for Mr. B., and he doubted whether Mr. B. would be able to lift and carry more than ten pounds.  Id.  Dr. Young opined Mr. B. could probably do a sitting job, but if it required computer use or any kind of fine movement with his hands that would be difficult due to his carpal tunnel. AR349.  Dr. Young also stated Mr. B. had limited ability to stoop, kneel, or climb due to his back pain.  Id.

Mr. B. was seen by Dr. Tinguely on August 7, 2019, for follow-up on chronic neck and back pain treated with Norco.  AR367.  Mr. B. reported increased neck and backpain and said he was applying for disability.  Id. Examination revealed a stiff neck with limited ability to rotate.  AR368.  Mr. B. was referred to the Sanford Spine Team to get a firmer diagnosis for his disability claim.  AR369.

13

Mr. B. was seen by Dr. Janssen at Sanford Physical Medicine and Rehab on September 24, 2019, for low back, right leg, neck, and bilateral arm pain. AR407.  Mr. B.'s neck pain radiated to both arms as well as the low back with radiation to the right leg, and he had numbness and tingling in both upper extremities.  Id.  Dr. Janssen indicated he had not seen Mr. B. in more than three years.  Examination revealed tenderness to palpation over the right greater than left lumbar paraspinal muscles, normal strength, sensation, in the upper and lower extremities.  Id.  Dr. Janssen's diagnoses were L4-L5 disk herniation towards the left and right, left L5-S1 disk herniation with low back pain, lumbar discogenic pain, and lumbar radiculitis.  AR408. Electrodiagnostic evaluation and lumbar and cervical spine MRIs were planned.  Id.

The lumbar spine MRI was obtained on September 27, 2019, and showed multilevel degenerative changes most pronounced at L4-5 and L5-S1.  AR356. At L5-S1 there was a disc osteophyte complex with a shallow superimposed left subarticular protrusion, unchanged from April 28, 2016, that approaches but does not definitely deviate the transversing left S1 nerve root, a central annular tear, mild facet hypertrophy, and moderate severe bilateral neural foraminal narrowing increased from 2016.  Id.

The cervical spine MRI was obtained on September 27, 2019, and showed multilevel degenerative changes superimposed on a congenital canal narrowing, a right paracentral extrusion with superior migration at C5-6 likely impinging on the right C6 nerve root, and moderate canal narrowing at C5-6

14

and C6-7.  AR358.  The nerve root impingement flattens and deforms the ventral right aspect of the cord with a moderate central canal narrowing.  Id.

Mr. B. was seen by Dr. Janssen at Sanford Physical Medicine and Rehab on October 3, 2019, for follow-up on neck and back pain and bilateral upper extremity numbness and tingling.  AR380.  Mr. B.'s back pain had not improved since his last visit and radiated to both legs, worse with prolonged posture or increased activity.  Id.  Examination revealed tenderness to palpation over the bilateral lumbar paraspinal muscles, and slump testing[4] did not cause typical pain symptoms.  Id.  Electrodiagnostic evaluation was abnormal and revealed mild median neuropathy or carpal tunnel at both wrists.  AR381, 387.  Dr. Janssen also reviewed Mr. B.'s spine MRIs and stated the lumbar pathology appeared somewhat improved and the cervical MRI revealed a disc herniation near the C6 nerve root.  AR381.  Night splints were recommended for Mr. B.'s carpal tunnel, lumbar ESI for his low back, and possible cervical epidural for his neck.  Id.

Mr. B. received a lumbar epidural steroid injection on October 28, 2019, due to lumbar radiculitis.  AR413.

---

[4] A slump test is a clinical test used to assess the effects on the neuromeningeal tract (e.g. nerve root injury, meningeal irritation, meningitis, disk disease, or central nervous system tumors).  The patient is directed to sit slumpted forward, flexing the entire trunk.  The patient's foot is dorsiflexed and the knee is then extended.  Inability to extent the knee fully or production of back or leg pain symptoms, or both, are positive signs.  See https://medical-dictionary.thefreedictionary.com/slump+test, (last visited Oct. 12, 2022).

Mr. B. was seen by Dr. Tinguely on November 6, 2019, for follow-up on chronic neck and back pain and the record states Mr. B. continued on Norco for pain and was now "locked in" with the spine team and recently had an ESI in the lumber spine that resulted in a spinal HA (headache)[5], requiring a blood patch.  AR363, 400.  Mr. B. reported he thought the ESI helped with his pain and he was not getting the intense cramping.  AR363.

Mr. B. reported to the Physical Medicine and Rehab Clinic on November 11, 2019, that he felt pretty good and was not getting the sharp pain down the right leg.  AR399.  He said he felt great up until the prior day when he started having trouble walking and getting sore.  Id.

Mr. B. reported to the Physical Medicine and Rehab Clinic on December 2, 2019, that he had zero improvement from the epidural injection, his pain was back to where it was before the injection.  Id.

Mr. B. was seen by Dr. Janssen at Sanford Physical Medicine and Rehab on December 23, 2019, for follow-up on low back, hip and leg pain.  AR398. Mr. B. reported that the prior epidural injection helped for about three days. Id.  Examination revealed a slumped forward posture, and tenderness to palpation of lumbar paraspinals.  Id.  Electrodiagnostic evaluation was planned.  Id.

---

[5]A spinal headache occurs when cerebrospinal fluid leaks out of the meninges (the tissue surrounding the spinal cord).  See https://my.clevelandclinic.org/health/diseases/17927-spinal-headaches#:~:text=A%20spianl%20headache%20is%20a,the%20brain%20and%20spinal%20cord., (last visited Oct. 12, 2022).

Mr. B. was seen by Dr. Johnson at Sanford Physical Medicine and Rehab on January 7, 2020, for acute right-sided low back pain with sciatica laterally. AR382.  Mr. B. had low back pain with pain going down his right leg causing him to buckle at times.  Id.  Mr. B. had a lumbar epidural on October 28, 2019, but was having a hard time standing straight up due to back pain and has a hard time finding a comfortable position.  Id.  Examination revealed ambulation with a slightly forward flexed posture at the waist.  AR384.  EMG testing indicated no nerve root dysfunction indicating Mr. B. appears to have a mechanical low back problem.  AR385.  Dr. Johnson stated there could certainly be some irritation of the nerve roots, but no evidence of radiculopathy.  Id.

Mr. B. was referred by Dr. Janssen and seen by Dr. Wellman at Sanford Neurosurgery and Spine on January 28, 2020, for evaluation of his back pain. AR394.  Dr. Wellman's examination notes for this exam appear to be missing from the record.  Id.

Mr. B. was seen by Dr. Tinguely on February 4, 2020, for a pre-operative physical prior to lumbar spine surgery scheduled for February 19, 2020. AR466.

Mr. B. was seen by Dr. Glatt at Sanford Surgical Associates on February 4, 2020, for evaluation of anterior exposure for planned back surgery due to intractable back pain.  AR501-502.

Mr. B. underwent an L4-5, L5-S1 anterior lumbar interbody fusion surgery performed by Dr. Wellman on February 19, 2020, with an L5-S1 plate and screw construct.  AR477, 481.

Mr. B. was seen by Dr. Tinguely on March 10, 2020, for follow-up after his back surgery and reported being extremely stiff and sore if he sits too long or lays down too long.  AR612.  He said he was not as hunched over as prior to the surgery.  Id.  Dr. Tinguely described Mr. B. as doing pretty well from a post-op perspective but started him on Norco for pain.  AR613.

Mr. B. was seen by Dr. Tinguely on June 4, 2020, for follow-up after his back surgery and reported feeling he was still recovering and had concerns that the surgery did not help much at all.  AR615.  He was taking Norco and reported his pain was bothering him more in his upper back, he had trouble bending since the fusion, and had trouble wiping after bowel movements.  Examination revealed he was still pretty stiff and walked "straight-backed" and slowly.  AR616.  Dr. Tinguely noted that unfortunately it did not seem that the surgery helped much with Mr. B.'s pain or mobility, and he would greatly benefit from physical therapy, but he could not afford it.  Id.

Dr. Tinguely submitted a letter on June 12, 2020, in support of Mr. B.'s disability claim in which she stated Mr. B. had severe arthritis and radiculopathy in his cervical, thoracic, and lumbar spine, and his recent spine surgery failed to provide the relief needed to get back to work.  AR611. Dr. Tinguely stated that given Mr. B.'s ongoing pain and mobility difficulties she felt it was in his best interest to apply for disability.  Id.

18

Mr. B. was seen by Dr. Tinguely on August 28, 2020, for follow-up on his chronic pain.  AR618.  Mr. B. continued to take Norco for pain.  Id.  He had recently clipped in the shower, which exacerbated his upper back pain.  Id.  Examination revealed Mr. B. was very stiff and walked hunched over.  AR619.  Referral to the Spine Center was planned if Mr. B. could obtain insurance.  Id.

Mr. B. was seen by Dr. Tinguely on January 7, 2021, for follow-up on his chronic pain, and also reported having extreme pain in his toes in both feet, and a popping sensation in his toes when he walks or bends them.  AR628.  Dr. Tinguely's assessments included chronic pain syndrome, low back pain, and pain in left and right toes.  AR629.

A cervical spine MRI was obtained on Mr. B. on May 7, 2021, that showed multilevel disc desiccation, with mild disc space height loss at C5-6 and C6-7.  AR644.  The MRI showed that left neural foraminal stenosis at C4-5 had progressed since September 27, 2019, a disc bulge asymmetric to the right, bilateral facet arthropathy, and bilateral uncovertebral hypertrophy resulting in moderate thecal sac stenosis and indentation of the cord without cord edema, and neural foraminal stenosis moderate to severe on the right and moderate on the left, a disc bulge at C6-7 with moderate thecal sac stenosis and contact with the cord without edema, and moderate to severe bilateral neural foraminal stenosis, unchanged.  Id.  The impression was multilevel degenerative spondylosis with progression at C4-5 and C5-6 and a diagnosis of cervical radiculopathy.  AR641, 644.  The MRI had been planned in February

but not completed due to anxiety, and then was delayed again due to illness. AR650.

Dr. Tinguely submitted a letter on September 7, 2021, in support of Mr. B.'s disability claim in which she stated Mr. B. had severe arthritis and radiculopathy in his cervical, thoracic, and lumbar spine, and his recent spine surgery failed to provide relief and Mr. B. continues to struggle with pain and stiffness.  AR39.  Dr. Tinguely stated that given Mr. B.'s ongoing pain and mobility difficulties she felt it was in his best interest to apply for disability.  Id.

**C.    State Agency Assessments**

The State agency medical consultant at the initial level reviewed the file on August 8, 2019, and stated that for the evaluation period of "Date Last Insured: 9/30/2018" there was insufficient medical evidence in the file to assess the claim for that period.  AR80.  The medical consultant found Mr. B. had severe impairments of disorders of the back and inflammatory arthritis and nonsevere impairments of asthma, other disorders of the gastrointestinal system, and other unspecified arthropathies of the musculoskeletal system.  Id. For the "current period" the medical consultant found Mr. B. could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about six hours and sit about six hours in an 8-hour workday, and Mr. B. could never perform climbing, balancing, stooping, kneeling, crouching, or crawling. AR81-2.  The medical consultant included no manipulative limitations and stated there was insufficient evidence in the file to establish a medically determinable impairment of carpal tunnel syndrome "without specialist input

20

and no objective evidence to base an MDI." AR82. There is no indication in the State agency reports at the initial level that a psychological consultant ever reviewed the file, and no mental RFC was provided. AR79-83.

The State agency medical consultant at the reconsideration level reviewed the file on April 2, 2020, and stated that for the evaluation period of "Date Last Insured: 9/30/2018" there was insufficient evidence in the file to assess the claim for that period. AR95. The medical consultant found Mr. B. had severe impairments of disorders of the back and inflammatory arthritis and nonsevere impairments of asthma, other disorders of the gastrointestinal system, and other unspecified arthropathies of the musculoskeletal system. Id. For the "current period" the medical consultant found Mr. B. could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about six hours and sit about six hours in an 8-hour workday. AR105. The reconsideration level consultant found Mr. B. could climb, kneel, crouch, and crawl frequently, occasionally stoop, and had unlimited balancing. Id. The medical consultant included no manipulative limitations and again stated there was insufficient evidence in the file to establish a medically determinable impairment of carpal tunnel syndrome "without specialist input and no objective evidence to base an MDI." AR106.

The psychological consultant at the reconsideration level reviewed the file on April 3, 2020, and found that Mr. B. had nonsevere depressive disorders and substance abuse disorders. AR95-96. The consultant found that Mr. B.

21

had mild limitations in interacting with others and in adapting or managing himself.  AR96.  No mental RFC was provided by the consultant.  Id.

**D.      Mr. B.'s Testimony at the ALJ Hearing**

Mr. B.'s hearing was held strictly by telephone due to Covid-19.  AR43. Mr. B.'s non-attorney representative informed the ALJ that Mr. B. had recently been scheduled for a new upper back MRI at Sanford and he had been unable to complete the MRI due to a panic attack, and it was being rescheduled. AR44-45.  The ALJ stated she would not leave the record open for the new MRI.  AR46.

Mr. B. testified that his problems with his lower and upper back, knees, elbows, and feet keep him from working fulltime.  AR50.  Mr. B. said his back surgery limited his mobility, but he still had the pain, and instead of crouching over for relief the fusion holds him straight up.  AR50-51.  He said sitting or standing too long or lifting causes back pain.  AR51.  Mr. B. said he lays down to take the pressure off his back and estimated he does that five times per day at least.  Id.  Mr. B. said he gets seventy-five hydrocodone pills per month for his pain, which wasn't nearly enough to take the pain away, but he had stomach issues so that is it.  AR55.

Mr. B. testified his elbow problems come and go and are triggered by repetitive motion.  AR54.  Mr. B. said he had prior surgery on his right shoulder, and it was not so bad, but he had received at least ten shots in his left shoulder when he was trying to work.  AR54-55.  Mr. B. said that now that

he was not working as much, he still felt the pain in his left shoulder, and he could not raise his arm above his shoulder.  AR55.

Mr. B. testified his normal weight was 155 pounds and he had gained twenty to twenty-five pounds since his back surgery.  AR56.  Mr. B. attributed his weight gain to being less active and depression.  Id.  Mr. B. said his pain affects his concentration, and he gets angry and short-tempered.  AR57.  The ALJ asked him if he got counseling or medication to help with his depression and Mr. B. said he did not have insurance and just does what he can.  AR58.

The ALJ asked Mr. B. how he was managing during the hearing and Mr. B. testified that the ALJ could not see him because it was a phone hearing, but he was up and moving, then back sitting.  Id.

Mr. B. testified that his lack of insurance had a huge impact on his treatment.  Id.  He said he had been unable to get "aftercare" treatment.  AR59.

## E.    The Vocational Expert Testimony

The VE was asked a hypothetical that reflected the limitations identified in the RFC determined by the ALJ for the period July 1, 2017, through November 1, 2018, and the VE testified the individual would be unable to perform any of Mr. B.'s past work.  AR71.  The VE testified there would be other jobs the individual could perform and identified occupations in response providing the number of jobs available nationally for each occupation.  Id.

The VE was asked a hypothetical that reflected the limitations identified in the RFC determined by the ALJ for the period November 1, 2018, through the date of the decision.  AR71-72.  The VE asked the ALJ if that hypothetical

23

was more of a "sit/stand option" and the ALJ stated the hypothetical was as stated. AR72. The VE testified it would put a person at the sedentary level. Id. The ALJ stated she wanted light jobs, not sedentary and the VE testified that would require a "sit/stand option." AR72-74. The VE testified that light jobs would have to be reduced in numbers by half with a "sit/stand option," and the ALJ stated, "All right. Okay. All right, go ahead." AR74. The VE then identified the occupations of small parts assembler, parking lot attendant, and photocopy operator giving the number of jobs available nationally and cutting them in half due to the "sit/stand option." Id. The VE testified that the "sit/stand option" meant the person could sit and stand at will and they would be provided a stool. Id. The VE stated that the person could change position with any frequency, but they must remain on task when they change positions. AR75. The VE testified that the issue of a "sit/stand option" is not addressed in the Dictionary of Occupational Titles ("DOT") and her answers were based on her education and work experience. AR76. The VE testified that an individual who was off task more than five percent of the time would be unable to maintain employment. Id.

The ALJ asked the VE, "And regarding your testimony today, you gave several jobs. Are these jobs available across several regions, of the country?" and the VE answered, "Yes." Id.

## DISCUSSION

### A.      Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by "substantial evidence [i]n the record as a whole."  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)). "[S]ubstantial evidence [is] defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support [the Commissioner's] conclusion.' " Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted).  Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination." Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)

(quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). "[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings," the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine whether an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). "Erroneous interpretations of law will be reversed." Id. The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

**B.      The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.[6]  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

> **Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.
>
> **Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments, the applicant is not disabled and the inquiry ends at this step.  NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).
>
> **Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320

---

[6] Although Mr. B. has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to one of the Titles where the corresponding regulation is identical.  It is understood that both Titles are applicable to Mr. B.'s application.  Any divergence between the regulations for either Title will be noted.

n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e)-(f); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five. 20 C.F.R. § 404.1520(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(g).

## C.    **Burden of Proof**

The plaintiff bears the burden of proof at Steps One through Four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th

Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## D.    Assignments of Error

Plaintiff asserts four errors with multiple subparts.  First, Mr. B. alleges that the ALJ failed to identify all medically determinable impairments and determine the severity at Step Two.  Docket No. 11, p. 1.  Second, plaintiff alleges that at Step Four, the ALJ erred in calculating Mr. B.'s RFC because (1) the ALJ bifurcated the claim, (2) the RFCs were not supported by substantial evidence, and (3) the ALJ failed to consider Mr. B.'s mental limitations.  Docket No. 11, pp. 1, 15.  Third, plaintiff alleges the Commissioner failed to fully and fairly develop and consider the evidence (1) when the ALJ failed to hold the record open to obtain and consider Mr. B's new MRI and subsequently, (2) when the Appeals Council failed to address the submitted new MRI in its written denial.  Docket No. 11, p. 1.  Fourth, the plaintiff alleges the ALJ failed to meet its burden to identify jobs Mr. B could perform in the national economy.  Id.

### 1.    At Step Two, Whether the ALJ Failed to Identify All Medically Determinable Impairments.

#### a.    The Applicable Law

Plaintiff alleges that the ALJ at Step Two failed to identify severe impairments related to Mr. B.'s upper extremities: Mr. B.'s hands, wrists, elbows, and both shoulders.  AR236; Docket No. 16, p. 1.  Mr. B. alleges that

the ALJ failed to find a severe impairment of carpal tunnel.  Docket No. 11, p. 6.

At Step Two, "[a] physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); see Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (A claimant's "subjective complaints" alone are not sufficient to establish an impairment.).  The claimant bears the burden to show that their impairment is severe.  42 U.S.C. § 423(d)(2)(A).

The principal requirement regarding impairment severity is "the individual's inability to engage in any SGA by reason of the impairment." Social Security Ruling ("SSR") 85-28, 1985 WL 56856 *1 (1/1/85).[7]  "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."[8]  20 C.F.R. § 416.922(a).  Alternatively, a claimant has severe impairments when they demonstrate through medical evidence that they possess more than slight abnormalities or a combination of abnormalities

---

[7] Social Security Rulings are agency rulings "published under the authority of the Commissioner of Social Security and are binding on all components of the Social Security Administration." 20 C.F.R. § 422.408 (1989); see Heckler v. Edwards, 465 U.S. 870, 873, n. 3 (1984).

[8] Basic work activities include: physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in routine work setting.  20 C.F.R. § 416.922(b).

which would have more than a minimal impact on their ability work.  SSR 85-28, 1985 WL 56856 *3 (1/1/85); see also Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3rd Cir. 2003) ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue.").  Any severe impairments established at Step Two will be considered at subsequent steps of the sequential evaluation process.  See 20 C.F.R. § 416.945(e) ("[The Social Security Administration] will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity [at Step Four].)."

Mr. B. cites Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007), for the proposition that the failure to identify a severe impairment at Step Two is not harmless error but is instead grounds for reversal.  See Docket No. 11, p. 3.  In Nicola, the severe impairment the claimant alleged the ALJ failed to identify was borderline intellectual functioning.  Nicola, 480 F.3d at 887.  The Eighth Circuit noted when such a diagnosis is supported by sufficient medical evidence, it should be considered severe.  Id.  The court held the ALJ's failure to identify the impairment as severe was not harmless error.  Id.  The court reversed and remanded the case to the Commissioner for further proceedings.  Id.

As noted in Lund v. Colvin, Civ. No. 13-113 (JSM), 2014 WL 1153508 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit are not in agreement about the holding of Nicola.  Some courts have interpreted it to

31

mean that an ALJ's erroneous Step Two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other impairments to be severe and therefore continued the sequential analysis. Other courts have declined to interpret Nicola as establishing a per se rule that any error at Step Two is reversible error, so long as the ALJ continues with the sequential analysis. See Lund, 2014 WL 1153508, at *26 (gathering cases). The central theme in the cases which hold reversal is not required is that "an error at Step Two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC." Id. (quoting Johnson v. Comm'r Soc. Sec., Civ. No. 11-1268 (JRT/SER), 2012 WL 4328413, at *21-22 (D. Minn. July 11, 2012)).

### b.    The ALJ Decision

The ALJ determined that Mr. B. had the following severe impairments: cervical degenerative changes with right C5-C6 disc herniation; thoracic kyphosis; thoracic degenerative changes; lumbar degenerative changes; median neuropathy at the wrist; and asthma under "SSRs 85-28 and 96-3p and 20 CFR 404.1521 and 416.921." AR14.

The ALJ addressed Mr. B.'s pain in his toes and determined that it did not meet a medically determinable impairment. Id. The ALJ reported that Mr. B.'s shoulder pain "might be related to his cervical and/or thoracic impairments. However, the evidence does not reflect the presence of any standalone shoulder-related medically determinable impairment." Id. Mr. B.'s gastrointestinal reflux disease was found to be a non-severe medically

32

determinable impairment because it did not limit his ability to engage in basic work tasks.  Id.  Similarly, Mr. B's medically determinable mental impairment[9] of dysthymic disorder/depression was determined non-severe as it caused no more than a minimal limitation to his ability to perform basic mental work activities under "20 CFR 404.1520a(d)(1) and 416.920a(d)(1)."  AR15.  The ALJ did not address Mr. B.'s elbow pain, nor specifically, Mr. B.'s "carpal tunnel" at Step Two.  AR14-16.  The ALJ stated:

> As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources.  The undersigned has fully considered the medical opinions and prior administrative medical findings.

AR23.

Such a statement is consistent with 20 C.F.R. § 404.1520(c).  Having found a severe or combination of severe medically determinable impairments, the ALJ continued the sequential evaluation process.  AR16.

### c.   The Record Evidence on Mr. B.'s Upper Extremities

An August 28, 2017, diagnostic imagining ordered in response to Mr. B.'s shoulder pain revealed no acute osseous abnormality.  AR337.  The report by Dr. Jordahl M.D., found normal cervical spine alignment, tissues unremarkable, and no displaced cervical spine fracture.  AR337.

---

[9] In his brief, Mr. B. alleges the ALJ erred at Step Four when addressing his mental evaluations in calculating his RFC, not a Step Two. The court will address the ALJ's evaluation of Mr. B.'s mental impairments and limitations at Step Four.  Docket No. 11, pp. 1-7.

At a February 27, 2018, visit to Dr. Tinguely, Mr. B. discussed his pain for his back and neck.  AR332.  Mr. B. stated that "he tries to remain as active as possible . . . [that] he doesn't want injections/epidurals because they didn't work in his shoulders after having so many of them."  AR332.  No acute distress was noted.  AR332.  Dr. Tinguely made no assessments on Mr. B.'s upper extremities.  AR333.

At a June 20, 2018, visit to Dr. Tinguely, Mr. B. discussed his meds for his back and neck pain.  AR329.  Mr. B. stated that he had hurt his right elbow lifting drywall and was treating the injury with ibuprofen, heat, and ice.  AR329.  He informed Dr. Tinguely that it seemed to be finally getting better.  AR329.  Mr. B. stated that both his hands were numb the morning of the exam, that this was typical and that things got better throughout the day.  AR330.  Mr. B. planned to travel to Tennessee to do brick work stating, "he can handle it."  AR329.  He also informed Dr. Tinguely that he still had work in Sioux Falls.  AR329.  No acute distress was noted.  AR330.  Dr. Tinguely's assessment included elbow joint pain and that the plan was to continue conservative treatment.  AR330.

At an August 22, 2018, visit to Dr. Tinguely, Mr. B. reported chronic wrist pain and acute pain in his right elbow.  AR326.  Mr. B. thought his elbow was getting better but now was getting worse again after picking up a gallon of paint.  AR326.  Mr. B. was medicating with Norco, ibuprofen, and Tylenol.  AR326.  Mr. B. stated that he was "getting by on his current medications" to manage his wrist pain.  AR326.  No acute distress was noted.  AR327.  Mr. B.

34

told Dr. Tinguely that he was applying for disability as he finds that he cannot do the work he was trained to do as a brick mason. AR326. Dr. Tinguely reported that Mr. B.'s right elbow pain was consistent with tendonitis. AR327. Naproxen was prescribed for his elbow and wrist pain. AR327.

At a September 13, 2018, visit to Dr. Tinguely, Mr. B. reported chronic pain in his hands and right elbow pain. AR324. Mr. B. informed Dr. Tinguely, that "things don't seem to be getting better, but they're also not getting worse" regarding his chronic hand pain. AR324. Mr. B. reported that he "still does odd jobs around town." AR324. No acute distress was noted. AR325. Dr. Tinguely assessed Mr. B. with elbow joint pain, with no mention of other upper extremities. AR325. X-rays were performed on Mr. B.'s right elbow with AP, lateral, and oblique views being normal. AR325. Dr. Halgeson, M.D., who performed the x-rays reported "no acute osseous abnormality" of the right elbow. AR336. Dr. Tinguely referred Mr. B. to the procedures clinic for elbow injections. AR326. Mr. B. was to continue prescription Norco and naproxen for pain. AR325.

At a November 20, 2018, visit, Mr. B. reported shoulder and hand pain to Dr. Tinguely. AR321. Mr. B. reported "terrible spasms in his hands if he does anything more than an hour or so." AR322. No acute distress was noted. AR324. Dr. Tinguely assessed Mr. B. with arthralgia of hand and shoulder joint pain. Id. Dr. Tinguely reported that Mr. B was "doing well on his current dose of pain medication" and no changes were made to his treatment plan. AR323.

35

Dr. Tinguely wrote a letter in support of Mr. B.'s disability application on May 20, 2019. AR342. In the letter, Dr. Tinguely referenced Mr. B.'s pain and weakness in his lower back, neck, and elbows, his possible nerve root irritation of his lumbar spine, his multilevel degeneration of his cervical spine, but made no mention of any other upper extremities. AR342.

At a May 9, 2019, visit with Dr. Tinguely, Mr. B. reported chronic neck and back pain, no upper extremities were reported or assessed. AR370. No acute distress was noted. AR371. No changes in medications were ordered for his reported pain. AR371.

Dr. Reinschmidt, M.D., who x-rayed Mr. B.'s hands on July 11, 2019, determined that Mr. B. had "mild osteoarthritis without acute bony abnormality." AR350.

Dr. William Young, M.D.'s assessment of Mr. B. at a July 17, 2019, visit was that Mr. B. had "chronic neck and back pain secondary to multilevel degenerative disease of the spine, and carpal tunnel disease, bilaterally." AR348. Mr. B. reported numbness in the median nerve distribution of both hands. AR348. Dr. Young examined Mr. B. and found "sensation in his hands to be fairly intact in both, but his symptoms do fit the diagnosis of carpal tunnel." AR348.

At an August 7, 2019, visit with Dr. Tinguely, Mr. B. reported chronic neck and back pain, no upper extremities were reported or assessed. AR367. No acute distress was noted. AR368. No changes in medications were ordered for his reported pain. AR369.

36

On October 3, 2019, Dr. Christopher Janssen, M.D. examined Mr. B. Mr. B reported pain in his neck occasionally radiating into his arm, and bilateral upper extremity numbness and tingling.  AR380.  Dr. Janssen reported that Mr. B. was in no apparent distress.  AR380.  Dr. Janssen conducted an electrodiagnostic evaluation and diagnosed Mr. B. with mild median neuropathy at the wrist.  AR381.  For the treatment plan, Dr. Janssen stated, "for carpal tunnel syndrome,[10] recommend resting night splints." AR381.

At a November 6, 2019, visit with Dr. Tinguely, Mr. B. reported chronic neck and back pain, no upper extremities were reported or assessed.  AR363. No acute distress was noted.  AR364.  No changes in medications were ordered for his reported pain.  AR365.

At a January 7, 2020, visit, Dr. Janssen, ordered an EMG nerve conduction study from Dr. Peter Johnson, M.D.  AR385.  Dr. Johnson stated that "in addition to this exam [the EMG] all prior diagnostic tests and findings have been reviewed in the medical records."  AR397.  The results were a diagnosis of paresthesia of the right arm, but no evidence of peripheral neuropathy.  AR385.  Results were "normal right sural sensory nerve conduction study and also normal right fibular and tibial motor nerve conduction studies."  AR385.

---

[10] Dr. Janssen appears to use the diagnosis for carpal tunnel syndrome and mild median neuropathy at the wrists interchangeably.

37

At this same visit, Dr. Janssen cited evidence from Mr. B.'s electrodiagnostic study of "mild bilateral median neuropathy at the wrist (carpal tunnel syndrome) affecting sensory components."  AR387.  Further, "there is no electrodiagnostic evidence of any other cervical radiculopathy or generalized peripheral neuropathy in either upper limb."  Id.

On May 7, 2021, Mr. B. obtained a cervical spine MRI, several months after his ALJ February hearing and subsequent March ALJ determination. AR644.  This MRI was compared with Mr. B.'s previous MRI conducted in September 2019.  Id.  The new MRI showed, "left neural foraminal stenosis has progressed" at C4-C5, "progression of left neural foraminal stenosis" at C5-C6. Id.  Impression by Dr. David Krause, M.D. was, "multilevel degenerative spondylosis that is progressed at C4-C5 and C5-C6. . . . The remaining levels are unchanged."  Id.  The diagnosis was cervical radiculopathy.  AR639.  The May 7, 2021, MRI was submitted as additional evidence to the Appeals Council.  Docket No. 15 p. 20.

### d.  Mr. B.'s Testimony Regarding his Upper Extremities

At the ALJ hearing held on February 24, 2022, Mr. B. testified to his issues preventing him from fulltime employment.  AR50.  Mr. B. mentioned issues with his lower and upper back, feet, knees, elbows, and toes.  AR50. When asked whether he experienced neck pain, he responded, "[n]ot so much. That can come and go."  AR53.  When asked more about his elbows or arms, Mr. B. responded, "My elbows can come and go, and they're kind of triggered by repetitive motion. . . . My shoulders, my right one is not so bad, I've had

38

surgery on that one. . . . My left shoulder now, when I was working it was painful, and I had been going in for shots." AR54-55. Mr. B. did not testify to any other issues with his upper extremities including his hands or wrists. AR54-55.

### e.    The Court's Conclusion

This court finds that <u>Nicola</u> does not justify reversal because the ALJ found several severe impairments and continued the sequential process past Step Two. However, this court finds that at Step Two, the ALJ must consider the May 7, 2021, MRI submitted as additional evidence to the Appeals Council for a determination of the severity of Mr. B.'s upper extremity impairments as explained below.

Plaintiff asserts that the ALJ erred in not finding Mr. B.'s carpal tunnel syndrome a severe impairment. Docket No. 11 p. 5. The Commissioner asserts that Mr. B. was never diagnosed with carpal tunnel. Docket No. 15 p. 6. Both parties are incorrect. The ALJ found that Mr. B. had a severe medically determinable impairment of "median neuropathy at the wrists." AR14. A diagnosis of carpal tunnel was made by Dr. Young in July 2019. This was again diagnosed by Dr. Janssen on October 3, 2019, after reviewing Mr. B.'s electrodiagnostic evaluation. AR381. Dr. Janssen referred to this condition as both "mild bilateral median neuropathy at the wrists" and "carpal tunnel syndrome"[11] at the October 3, 2019, visit and the subsequent January 7, 2020,

---

[11] The Mayo Clinic defines carpal tunnel syndrome as, "pressure on the median nerve. . . . When the median nerve is compressed, symptoms can include numbness, tingling, and weakness in the hand and arm." <u>See</u>

visit.  See AR381, 387.  Further, the Commissioner conceded in the Joint

Statement of Material Facts that Mr. B. had been diagnosed with carpal tunnel

syndrome.  Docket No. 9 p. 9.  The ALJ appropriately considered the diagnosis

of carpal tunnel syndrome, i.e., median neuropathy at the wrist, by including

the severe impairment of median neuropathy of the wrists at Step Two.

 Plaintiff asserts the ALJ should have found Mr. B.'s elbow impairment

severe.  The ALJ did not address Mr. B.'s elbow issue at Step Two.  Mr. B. first

reported pain in his right elbow to Dr. Tinguely in June 2018 after injuring his

elbow lifting drywall.  "He reported using ibuprofen as well as heat and ice on

the elbow with notation of improvement."  AR18.  He was planning to travel to

Tennessee for a job that would involve brick work and stated that "he felt he

could handle the job."  Id.  It was not until a later visit that X-rays were

performed on Mr. B.'s right elbow with AP, lateral, and oblique views being

normal.  AR325.  Dr. Halgeson, M.D., who performed the X-rays reported "no

acute osseous abnormality" of the right elbow.  AR336.  At the June 2019 exam

with Dr. Young, "[c]laimant had normal strength in the upper extremities"

(referring to Ex. 8F, pg. 6.)  AR20.  In November 2018, Mr. B. reported that he

was able to work around the house.  Id.  Dr. Tinguely reported that Mr. B.'s

elbow issues "seem c/w [consist with] tendonitis."  AR327.  Dr. Tinguely

referred Mr. B. to the procedures clinic for elbow injections and continued

---

Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/carpal-
tunnel-syndrome/symptoms-causes/syc-20355603 (last visited Oct. 20,
2022).

Mr. B. on naproxen for the pain.  AR326.  Mr. B. admits during his testimony that his elbow pain comes and goes and is related to repetitive motion.  AR54.

The ALJ addressed Mr. B.'s reported shoulder issue and assessed that it "might be related to her [sic] cervical and/or thoracic impairments" and was not a medically determinable impairment.  AR14.  Mr. B. did have surgery on his right shoulder and receive injections for his shoulder pain, however by his own testimony, Mr. B. stated his right shoulder was not so bad post-surgery, and it was his left shoulder that caused him pain.  AR54-55.  Cervical spine x-rays were obtained on August 28, 2017, due to Mr. B.'s ongoing left shoulder pain and revealed no acute abnormality.  AR337.  In February 2018, Mr. B. declined further injections on his shoulders.  AR332.  Throughout the medical record, Mr. B. reported shoulder pain and was responding to Dr. Tinguely's planned prescriptions for pain management up until he stopped working.  In October 2019, Dr. Janssen examined Mr. B.  Mr. B reported pain in his neck occasionally radiating into his arm, and bilateral upper extremity numbness and tingling.  AR380.  The electrodiagnostic evaluation revealed cervical, lumbar, and wrist issues, but no radiculopathy.  AR381.  The May 7, 2021, MRI included a diagnosis of cervical radiculopathy.[12]

---

[12] "Cervical radiculopathy is a pain and/or sensorimotor deficit syndrome that is defined as being caused by compression of a cervical nerve root [1–4]. The compression can occur as a result of disc herniation, spondylosis, instability, trauma, or rarely, tumors. Patient presentations can range from complaints of pain, numbness, and/or tingling in the upper extremity to electrical type pains or even weakness." John M. Caridi, *Cervical Radiculopathy: a Review*, PubMed.gov, Sept. 9, 2011 https://pubmed.ncbi.nlm.nih.gov/23024624/ (last visited Oct. 26, 2022).

The ALJ's determination of whether Mr. B.'s elbow and shoulder impairments are severe must consider the May 7, 2021, MRI cervical radiculopathy diagnosis.  Dr. Tinguely in her June 2020 letter described Mr. B.'s severe arthritis and radiculopathy effected his mobility issues, but she did not quantify Mr. B.'s functional capacity.  AR24, 611, 639.  The ALJ in its decision prior to the new MRI speculated whether Mr. B.'s shoulder issues were related to the cervical impairments.  AR14.  The new MRI reveals increased deterioration and a new diagnosis.  For these reasons, this court reverses the Commissioners' decision and remands for a new Step Two analysis on the severity of Mr. B.'s upper extremity impairments in consideration of the May 7, 2021, MRI.

### 2. At Step Four, Whether the ALJ Erred When Formulating Mr. B.'s RFC.

#### a.    The Applicable Law

Plaintiff alleges that at Step Four, the ALJ erred in calculating Mr. B.'s RFC because (1) the ALJ bifurcated the claim, (2) the RFCs were not supported by substantial evidence, and (3) the ALJ failed to consider Mr. B.'s mental limitations.  Docket No. 11 pp. 1, 15.

Residual functional capacity ("RFC") is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).  "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability." Cooks v. Colvin, CIV. 12-4177-KES, 2013 WL 5728547, at *6 (D.S.D. Oct. 22, 2013) (quoting 20 C.F.R. §

404.1545(b)).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; SSR 96-8p, 1996 WL 374184 (7/2/96).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all the relevant evidence . . . a claimant's residual functional capacity is a medical question."  Lauer, 245 F.3d at 703 (citations omitted).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p, 1996 WL 374184 (7/2/96).  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted."  Id.

For cases filed after March 2017, like this one, medical opinions from accepted medical sources about the nature and severity of an individual's impairment(s) are evaluated according to how supported the opinion is by objective medical evidence and supporting explanations and how consistent the opinion is with other medical and nonmedical evidence in the record.  20

43

C.F.R. § 404.1520c(c)(1) - (2).  Other considerations are the relationship the medical source had with the claimant, the length of their treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the kinds and extent of testing or examinations, and whether the medical opinion is in an area in which the medical source has expertise or specialization.  20 C.F.R. § 404.1520c(c)(3) – (5).

Acceptable medical sources include licensed physicians and psychologists.  20 C.F.R. § 416.902(a)(1) & (2).  It also includes licensed advanced practice registered nurses and physician assistants for issues within the scope of their licensed practice.  20 C.F.R. § 416.902(a)(7) & (8).

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ.  SSR 96-8p, 1996 WL 374184 *7 (7/2/96).  Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations.  Id.  However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.   20 C.F.R. § 404.1520c.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  SSR 96-8p, 1996 WL 374184 (7/2/96).  However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC."  Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id. "Impairments found at Step Two or Step Three, whether severe or not, should be considered while formulating the RFC but do not automatically translate into limitations on the claimant's ability to work." Gann v. Colvin, 92 F. Supp. 3d 857, 885 (N.D. Iowa 2015) (concluding that "the RFC is not simply a laundry list of impairments and limitations" and an RFC is not flawed simply because it does not reflexively recite the ALJ's prior findings under a previous step.); see also 20 C.F.R. § 404.1545(a)(1).

Finally, "to find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p, 1996 WL 374184 *1 (7/2/96) ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule."). The ultimate question is whether "substantial evidence [i]n the record as a whole" supports the ALJ's RFC formulation. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).

45

### b.    The ALJ Decision

The ALJ's first RFC formulation considered the time period from Mr. B.'s onset date of July 1, 2017, to November 1, 2018.  AR16.  The ALJ found Mr. B. capable of performing light work with the following limitations:

> [The] claimant could lift and/or carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk about 6 hours in a 8 hour work day, sit about 6 hours in an 8 hour work day and had unlimited push and pull except for the limitations in lifting and carrying.  The claimant could frequently climb ramps and stairs, and could occasionally climb ladders, ropes or scaffolds.  The claimant could occasionally stoop; and frequently kneel, crouch, and crawl.  The claimant could have occasional exposure to fumes, odors, dusts, and atmospheric conditions in defined in the SCO.

AR16.

The ALJ noted a change of RFC post-November 2018 to the date of decision as reduced light work with the following limitations:

> [The] claimant can lift and/or carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk about *4 hours in an 8-hour work day*, sit about 6 hours in an 8-hour work day, and has unlimited push and pull except for the limitations in lifting and carrying. The claimant can frequently climb ramps and stairs, and could occasionally climb ladders, ropes or scaffolds. *The claimant can rarely stoop*; and frequently kneel, crouch, and crawl. The claimant can have occasional exposure to fumes, odors, dusts, atmospheric conditions as defined in the SCO. *The claimant can frequently handle, finger, and feel.*[13]

AR18.

---

[13] The ALJ analyzed Mr. B.'s impairments chronologically.  Differences between the first RFC and second RFC are italicized.  Both RFCs were used to determine whether Mr. B. could perform his past relevant work at Step Four and whether there were jobs in the national economy that would accommodate reduced light work with the stated limitations at Step Five.  AR24-25.  Neither RFC includes limitations for "reaching."

### c.    The Record Evidence

In formulating Mr. B.'s first RFC, the ALJ considered Mr. B.'s testimony from the hearing and relevant evidence from the record.  AR17-18.  Mr. B. testified that he could not lift more than fifteen pounds, could not stand for more than fifteen minutes at most, and walk only about fifty steps before needing a rest.  AR17, 51.  The ALJ opined that "[Mr. B.] testified at the hearing to limitations that would make the regular, reliable, and sustained performance of even sedentary level tasks and work difficult."  AR17.

The ALJ found that the claimant's statements about the intensity, persistence, and limiting effects of his symptoms of both severe and nonsevere impairments were "not entirely consistent" with the record during this time period.  AR17.  The ALJ cited to a June 20, 2018, examination by Dr. Jennifer Tinguely, in which "[Mr. B.] was doing pretty well, including reasonable relief with pain medication management."  AR18.  Notably, Mr. B. was performing jobs below the substantial gainful activity which the ALJ assessed as, "reflects generally good overall functioning."[14]  AR17.

At the initial consideration phase, Dr. Ammie Maravelli, M.D. found that there was insufficient medical evidence in Mr. B.'s file to assess the medical claims for the time period since last insured (September 30, 2018).  AR80.  The assessment is dated August 8, 2019.  AR80.  The state agency consultant,

---

[14] Mr. B. was performing electrical and plumbing work in January 2018; traveled to Tennessee in June 2018 for what he thought would be a brick laying job but ended up successfully staining a deck; as of September 2018, he was still doing odd jobs around town.  AR18, 324.

Dr. Maravelli found that Mr. B.'s symptoms were "partially consistent" with the medical record.  AR80.  Dr. Maravelli's RFC assessment included: occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for 6 out of 8 hours in a workday, the same time period for sitting, and no limitations on push and/or pull in upper or lower extremities.  AR81.  Dr. Maravelli found that Mr. B. had postural limitations of never climbing, balancing, stooping, kneeling, crouching, or crawling.  AR82.  No manipulative limitations, or limitations for asthma were included.  AR82.  The state agency did not perform a mental RFC assessment. AR88.

At the reconsideration phase, Dr. Kevin Whittle, M.D. found that there was insufficient medical evidence in Mr. B.'s file to assess the medical claims for the time period since last insured (September 30, 2018).  AR95.  The assessment is dated April 2, 2020.  AR91.  However, Dr. Whittle did review what medical records were available.  Dr. Whittle believed that Dr. Young's RFC evaluation was more restrictive than was supported by his assessment of Mr. B.'s records.  AR106.  Dr. Whittle's RFC assessment was similar to Dr. Maravelli's RFC except that Dr. Whittle included the following postural limitations: frequently climbing ramps/stairs, kneeling, crouching, crawling; occasionally climbing ladders and stooping; and unlimited balancing.  AR105.

The ALJ found that the medical evidence of back arm/hand pain for post-November 2018, justified a more restrictive RFC with additional postural limitations.  AR23.  Additional limitations included hand manipulation, and

48

length of time standing, sitting, and walking.  AR23.  Further, the ALJ cited
medical evidence of Mr. B.'s lumbar spine issues necessitating surgery around
this time.  Id.  The ALJ also considered Dr. Young's July 2019 opinion and Dr.
Tinguely's May 2019 letter in its RFC analysis.  The ALJ found that Dr. Young's
opinion that Mr. B. should be limited to sedentary work was contradicted by
the medical evidence.  AR23.  The ALJ found Dr. Tinguely's opinion was also
contradicted by the medical evidence.  AR24.

### d.    The Court's Conclusion

The supposed "bifurcation" of the RFC determination is justified based
on change in Mr. B.'s medical record after November 2018.  The court agrees
with the ALJ that there was a marked change in Mr. B.'s record including
spondylosis/DDD in the thoracic spine and degenerative changes in the
cervical spine.  AR20.  Additionally, the ALJ properly evaluated and considered
plaintiff's mental limitations when calculating both RFCs.  However, the court
finds that the ALJ's RFC calculation is not supported by substantial evidence
because both RFC calculations did not consider the May 7, 2021, MRI, thus
remand for a new Step Four analysis is necessary.

### i.    The Bifurcation of the Claim

The ALJ calculated two RFCs for Mr. B., one representing the period
between the onset date to November 2018, and the second RFC representing
the period between November 2018 to the date of decision.  Plaintiff contends
that the "ALJ's bifurcation of [Mr. B.]'s claim with pre and post November 1,
2018, RFCs is arbitrary and left unexplained by the ALJ or supported by the

record." Docket No. 11 p. 7.  This court finds that such a distinction in time was justified and sufficiently explained by the ALJ.  For the period before November 2018, the ALJ compared Mr. B.'s testimony from the hearing to record evidence that Mr. B. had been performing electrical and plumbing work and traveling to Tennessee for work.  AR17-18.  Further, Dr. Jennifer Tinguely's June 20, 2018, examination notes stated that Mr. B. had reasonable relief with pain medication management, that the numbness in his hands subsided throughout the day, and that he had normal mental status.  AR18.

As of November 2018, the ALJ stated, "the undersign accepts that [Mr. B.] appears to have experienced some greater degree of functional limitation from November 2018."  AR19.  The November examination by Dr. Tinguely is the first time Mr. B. spoke of spasms in his hands.  Mr. B. reported to Dr. Tinguely that he could still work around the house.  AR20.  X-rays at a December 2018 visit showed spondylosis/DDD of the thoracic spine and degenerative changes in the cervical spine and reduced lumbar range of motion.  The ALJ explained, "the undersigned does find support for additional postural limitations, manipulative, standing and walking limitations particularly with the claimant's back and intermittent reports of hand/arm pain."  AR23.

This court finds that those suggested limitations are accurately reflected in the second RFC and are supported by the record.  Because the ALJ identified two time periods that resulted in two different RFCs (one for a full range of light work, the other for a reduced range of light work with additional

50

postural and manipulation limitations), both RFCs were considered at Step Four and Step Five. Both RFCs resulted in a finding that Mr. B. would be unable to perform any past relevant work, and that there were jobs that exist in the significant numbers in the national economy that Mr. B. could perform. AR24-26. The ALJ did not err when it found two different RFCs for the periods before and after November 2018.

### ii.    Substantial Evidence for the RFCs

Plaintiff asserts the RFCs are not supported by substantial evidence. Namely, that the ALJ erred when it relied on the state agency RFC assessments despite both medical consultants stating that "there was insufficient medical evidence in the file to assess the claim for the date last insured," and not including a reaching limitation in either RFC. AR80, 95.

As to the first assertion, the ALJ did not solely rely on the state agency RFC assessments. AR23. The ALJ stated that it "fully considered the medical opinions and prior administrative medical findings." AR23. In doing so, the ALJ determined that the DDS medical consultants stating that there was insufficient evidence prior to the date last insured was not considered a medical opinion. AR23. The ALJ found that Dr. Maravelli's RFC assessment of never being able to perform any postural activity was overly limiting. When considering Dr. Whittle's RFC, the ALJ noted that additional posturing, walk/stand/sit, manipulation and asthma limitations were warranted by the medical record. AR23. (The ALJ cited to Mr. B.'s testimony (AR17), Dr. Tinguely's June 2018, November 2018, June 2020, August 2020,

examinations, her May 2010 letter, (AR18-24), Dr. Young's July 2019
examination (AR20-21, AR23-24), and Dr. Janssen's December 2019
examination (AR21)).  The resulting RFCs were neither copied from the state
assessments nor from Dr. Young's report.  They were the determination of the
ALJ based on the record.

Plaintiff asserts there was sufficient evidence to justify a "reaching"
limitation in the RFCs.  The record evidence is mixed with regards to justifying
a reaching limitation.  Mr. B. did have a diagnosis of carpal tunnel, tendonitis
of the elbow, documented pain in his upper extremities and back as of the ALJ
hearing.  The May 7, 2021, MRI confirmed cervical radiculopathy and likely
impingement on the C6 nerve root.  AR407.  However, there was equal evidence
in the record of upper extremity strength.  AR89.

At the hearing, Mr. B. testified that issues with his elbows were triggered
by repetitive motion.  AR54.  Mr. B. stated that his shoulder pain prevented
him from lifting his arm above his shoulders.  AR55.  The ALJ acknowledged
testimony of Mr. B.'s lifting no more than fifteen pounds, but only if he is
careful.  AR17.  The ALJ stated that "[Mr. B.'s medically determinable
impairments could reasonably be expected to cause the alleged symptoms;
however [Mr. B.]'s statements concerning the intensity, persistence, and
limiting effects of these symptoms are not entirely consistent with the medical
evidence."  AR17, 19.

Before November 2018, the ALJ cites to Mr. B. continuing to work with his upper extremities.[15]  AR18.  "While not expressly indicative of substantial gainful activity reflects generally good overall functioning."  AR17.  At the June 2018 exam, Mr. B. reported that his elbow pain was mitigated by ibuprofen, heat and ice, and that the numbness in his hands was inconsistent.  AR18.  No acute distress was noted.  AR18.

After November 2018, the ALJ cited to examinations by Dr. Tinguely in which Mr. B. stated that the pain medications allowed him to continue working around his house.  AR20.  Mediation by pain medication is noted in the ALJ's decision and throughout the medical record.  AR20.  The ALJ referenced an examination in December 2018 found that Mr. B. "had normal strength in the upper and lower extremities, intact sensation, and normal gait."  AR20.  The ALJ noted that Dr. Young's assessment that Mr. B. should be limited to sedentary level tasks was inconsistent with Dr. Young's findings that "strength and sensation was intact bilaterally in his upper and lower extremities."  AR21.  Mr. B. was able to fully flex his back, albeit with some difficulty.  AR21.  Post back surgery, Mr. B. continued to complain of pain and lack of flexibility in his back.  AR612, 615.

The ALJ cited to Dr. Janssen's assessment that Mr. B. "exhibited a slumped forward posture and had some tenderness to palpitation over the lumbar paraspinal muscles," however Mr. B. did not present apparent distress during the examination.  AR21.  The ALJ referenced a February 2020 exam at

---

[15] Supra note 14.

Surgical Associates, in which Mr. B. exhibited no distress, and having no motor or sensory deficits and was likewise ambulating without difficulty.  AR22.  Also, a June 2020 examination with Dr. Tinguely noted post-surgery that Mr. B. was stiff but did not reference particular problems with his ability to effectively ambulate.  AR22.  Based on all this information, the ALJ determined that Mr. B.'s post-surgical recovery would allow for a range of light level tasks including standing/walking for four hours in an eight-hour day.  Id.

The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based *on all the relevant evidence* . . . a claimant's residual functional capacity is a medical question."  Lauer, 245 F.3d at 703 (citations omitted) (emphasis added).  Here, the evidence concerning Mr. B.s ability to reach is divided.  On the one hand the 2019 MRI of his cervical spine documented nerve impingement, which might constitute objective medical evidence explaining Mr. B's symptoms of pain in his shoulders and resulting loss of function in reaching. AR407.  But his daily activities and some exam results point to no loss of function.  AR407.

A major piece of evidence that the ALJ did not have and so did not consider was the May 7, 2021, MRI of Mr. B.'s cervical spine.  That MRI documented a worsening of his cervical spine condition and diagnosed cervical radiculopathy, or impingement of nerve(s).  Because, as explained below, this court is reversing and remanding with instructions to consider that May 7, 2021, MRI, the court finds the ALJ should also on remand reweigh all the

evidence connected to Mr. B.'s neck/shoulders and determine whether his RFC should have more restrictive limitations on reaching in light of *all* the evidence.

All the jobs cited by the ALJ in the decision under Step Five included a reaching limitation of frequent – 1/3 to 2/3 time in an 8-hour workday. (Jobs listed under the first RFC for light work included: Photocopy machine operator – 207.685-014, Order Caller – 209.667.014, Cafeteria Attendant – 311.677-010; jobs listed under the second RFC for reduced light work included: Photocopy machine operator – 207.685-014, Small parts assembler – 706.684-022, Parking Lot attendant – 207.685-014).  AR25-27.[16]   The ALJ should consider whether the evidence points to a physical RFC for Mr. B. that includes a restriction to something less than "frequent" reaching.

### iii.    Mental RFC Evaluation

Plaintiff asserts that the ALJ erred when formulating Mr. B.'s RFCs by not including mental limitations associated with Mr. B.'s Step Two mental impairment and not explaining the omission.  Docket No. 11 p. 15.  The ALJ did not err because Mr. B.'s mental impairments were sufficiently considered when formulating both of his RFCs.

---

[16] During the hearing, the ALJ asked the VE for sedentary jobs, applying the proposed limitations of the second RFC with no reaching limitation. AR75-76. The VE supplied the following jobs which include a frequent reaching limitation: 249.587-018 document preparer, 669.687-014 dowel inspector, and 209.587-010 addresser.  Under 20 C.F.R. § 404.1597(b) if an individual can perform light work, they can also perform sedentary work unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

The ALJ first considered Mr. B.'s mental functioning at Step Two, finding that his medically determinable mental impairment of dysthymic disorder/depression was nonsevere.  AR14-15.  The ALJ evaluated Mr. B.'s mental function under "paragraph B" criteria independently from the mental evaluation conducted by the state agency.[17]  AR15, 96.  The ALJ found that Mr. B. had no limitations in the areas of understanding, remembering or applying information or concentrating, persisting or maintaining pace.  AR15.  The ALJ found that Mr. B. had mild limitation in the areas of interacting with others and adapting or managing oneself.  These determinations are consistent with the record evidence, Mr. B.'s testimony at the hearing, and the assessment of the state agency.  AR96.

The state agency opinions at the initial and reconsideration stages did not assess Mr. B.'s mental RFC.  The ALJ stated in its opinion, "[t]he mental RFC used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment."  AR16.  The detailed assessment the ALJ is referring to a consideration of severe and nonsevere impairments and any symptoms that would limit an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis for 8 hours a day, for 5 days a week, or an equivalent work schedule.  AR19; SSR 96-8p 1996 WL 374184 *1 (7/2/96).  The ALJ included such an analysis at

---

[17] Paragraph B criteria considers (1) understanding, remembering or applying information, (2) interacting with others, (3) concentrating, persisting or maintaining pace, (4) adapting or managing oneself.  20 C.F.R., Part 404, Subpart P, Appendix 1.

Step Four.  AR16-24.  The ALJ explained that "the claimant's *medically determinable impairments* could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  AR17.  Thus, taking the record as a whole, the ALJ found no additional mental limitations were warranted.

In Mr. B.'s testimony, he associated his mental health with his pain. AR57.  As to Mr. B.'s mental state, he testified to his depression in the context of weight gain.  AR56.  In response to symptoms affecting his mental health, Mr. B. stated that he felt angry, but that he was not undergoing counseling or taking medication.  AR58.  The ALJ noted that Dr. Tinguely reported in June 2018, that Mr. B. had "a normal mental status, including notation that he was oriented, had normal speech, and had a euthymic mood."[18]  AR18.  Mr. B. was first diagnosed with dysthymic disorder by Dr. Tinguely on August 22, 2018. AR325.  Mr. B.'s mood was "quite down."  AR328.  Dr. Tinguely offered counseling, but Mr. B. declined.  AR328.  He was prescribed Wellbutrin.  Id. Jerry Buchkoski, Ph.D. assessed Mr. B.'s mental limitations as: no limitation on ability to understand, remember, or apply information; mild limitation on interacting with others; no limitation on concentration, persistence, or to maintain pace; and mild limitation to adapt or manage oneself.  AR104.

---

[18] Euthymic mood is defined as "a normal, tranquil mental state or mood" See Merriam-Webster, https://www.merriam-webster.com/medical/euthymia (last visited Oct. 20, 2022).

Explanation on the assessment acknowledged that Mr. B. was prescribed Cymbalta then subsequently Wellbutrin for his depression.  AR104. The ALJ noted that Dr. Tinguely reported in November 2018, that Mr. B. had "a normal mental status, including notation that he was alert, oriented, and pleasant with euthymic mood."  AR18.

Admittedly, the ALJ does not specifically name Mr. B.'s nonsevere dysthymic disorder/depression at Step Four, however in narrative fashion, the ALJ discussed Mr. B.'s treatment plans including medications for pain, medications for depression, medical evaluations on Mr. B.'s mood and mental status, and Mr. B.'s self-care.  AR16-24.  The ALJ referenced Mr. B.'s normal mental status at exams five times between June 2018 and August 2020.  There is no record evidence of Mr. B. seeing a psychiatrist or counselor.  He was responding to Wellbutrin to manage his depression and pain.  AR22.  Mr. B. did testify that his mental health is affected by his pain, that he feels angry, but not violent.  AR57.  Mr. B. mentioned no other specific limitations.  AR57-59.  When asked whether he was able to keep a schedule or routine, he responded, "I can."  AR58.  He testified that he was not seeking counseling or medication to help with his anger issues because he doesn't have insurance. AR58.  However, when offered counseling for his depression by his Community Health physician in August 2018, Mr. B. declined treatment.  AR328. Additionally, the ALJ asked if Mr. B. had ever paid for any service by Falls Community Health, and he responded, "No, I have no income."  AR68-69.  The ALJ did not err because the RFCs were consistent with the record and the

determination on limitations was sufficiently explained with citations to the record.

### 3.   Whether the Commissioner Failed to Fully and Fairly Develop and Consider the Evidence.

Plaintiff asserts that the ALJ erred when it did not keep the record open after the hearing to accept Mr. B.'s new MRI, and that the Appeals Council erred when they failed to consider the new MRI thus failing to fully and fairly develop and consider the evidence.  Docket No. 11 p. 17-20.

### a.   The Applicable Law

An ALJ has the duty to fully and fairly develop the record.  Nevland v Apfel, 204 F3d 853, 857 (8th Cir. 2000) (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir.1983).  The ALJ must ensure before the close of the hearing that there is no additional evidence to submit or disclose.  See Hearings, Appeals and Litigation Law Manual "HALLEX" I-2-6-52 E.  "If the claimant or any representative indicates that there is additional evidence to submit, the ALJ will determine whether to leave the record open for submission of the evidence."  See 20 C.F.R. §§ 404.935(b),404.1513(b), 416.913(b), 416.1435(b); HALLEX I-2-6-59 B.  The ALJ must consider whether the evidence has a direct bearing on the outcome of the hearing; and the evidence could not have been obtained before the hearing.  SSA POMS DI 33015.030 (9/5/19).  The ALJ has discretion whether to keep the record open however, the SSA notes that these two factors should be applied in a flexible manner.  Id.

A claimant may submit evidence to the Appeals Council with their request for review.  See 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5).  The

evidence must be new, material, relate to the period on and before the date of the hearing decision, and there must be a reasonable probability that the additional evidence would change the outcome of the decision.  Id.  "To be 'new,' evidence must be more than merely cumulative of other evidence in the record."  See Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008) (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000)).  Further, to qualify as material, the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a preexisting condition.  Id.; Perks v. Astrue, 687 F.3d 1086, 1093 (8th Cir. 2012) (an MRI submitted to the Appeals Council contained no new information that was not already represented in the administrative record.).

After it has reviewed all the evidence in the ALJ hearing record and any additional evidence received, subject to the limitations on Appeals Council consideration of additional evidence under 20 C.F.R. § 404.970(a)(5), the Appeals council will make a decision or remand the case.  20 § C.F.R. § 404.979.  "When the Appeals Council has considered new and material evidence and declined review, [the Appeals Council] must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence."  Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir.1995) (noting that the Eighth Circuit, unlike some other circuits, does consider "tardy evidence" in the "substantial evidence equation.").

The Eighth Circuit has remanded cases where it was unclear whether the Appeals Council considered new evidence.  See Lamp v. Astrue, 531 F.3d 629,

632 (8th Cir. 2008) (the Appeals Council decision letter noted that it considered new evidence in the record as "Exhibit 10F" however it was unclear if "Exhibit 10F" included the explanatory letter.); Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000) (the Appeals Council decision letter mentioned "the additional evidence also identified on the attached Order of the Appeals Council" but failed to specifically mention a doctor's letter.).

### b.    The ALJ and Appeals Council Decision

During the hearing, the ALJ asked Non-Attorney Representative Heather Mueller if all exhibits had been received into the record.  AR44.  Ms. Mueller informed the ALJ that an attempt had been made to complete a second MRI, but that it was not completed due to Mr. B. having a panic attack.  AR45. Ms. Mueller informed the ALJ that the MRI had not been rescheduled as of the hearing.  The MRI had been scheduled for February 11, 2021, over two weeks prior to the hearing.  AR45.  The MRI was reportedly going to be of Mr. B.'s upper back.  AR45.  Based on lack of rescheduling and the fact that the panic attack occurred over two weeks before the hearing, the ALJ decided not to leave the record open.  AR46.

Mr. B. submitted a request for review to the Appeals Council on May 14, 2021.  Accompanying the review request was (1) a letter from Dr. Tinguely, (2) a brief by Disability Representative Heather Mueller, (3) a statement from Mr. B., and (4) the new MRI that was completed May 7, 2021.  AR1-4, AR633-52; Docket No. 15 p. 20.  The Appeals Council denied Mr. B.'s request for review. AR1.  The Appeals Council notice stated,

> We will review your case if . . . we receive additional evidence that
> you show is new, material, and relates to the period on or before
> the date of the hearing decision.  You must also show there is a
> reasonable probability that the additional evidence would change
> the outcome of the decision.  You must show good cause for why
> you missed informing us about or submitting it earlier.

AR1-2.

Under "Additional Evidence," the Appeals Council responded: "You

submitted letter from Jennifer Tinguely, M.D., dated September 7, 2021 (1

page).  We find this evidence does not show a reasonable probability that it

would change the outcome of the decision.  We did not exhibit this evidence."

AR2.  The Appeals Council exhibited the following evidence received:

| | |
|---|---|
| Exhibit 12B | Request for Review of Hearing Decision (i520) received May 14, 2021 (3 pages) |
| Exhibit 15E | Representative's Brief from Heather Mueller dated June 5, 2021 (2 pages) |
| Exhibit 16E | Undated Statement from Brian Bohner received June 5, 2921 (1 page) |

AR4.

The May 7, 2021, MRI that was submitted with the request for review is not

referenced in "Additional Evidence" nor was it exhibited.  AR2, 4.  The MRI

appears nowhere in the decision letter.  AR1-4.  The May 7, 2021, MRI appears

only in the administrative record.  AR633-52.

The MRI was conducted on May 7, 2021, and examined Mr. B.'s cervical

spine and diagnosed cervical radiculopathy.  AR639.  Findings included normal

alignment and normal vertebral body heights with benign bone marrow signal.

AR644.  There was normal morphology and signal of the spinal cord.  Id.  There

was multilevel disc desiccation, with mild disc space height loss at C5-C6 and C6-C7.  The epidural space was unremarkable.  <u>Id.</u>  The paravertebral soft tissues and imaged intracranial contents were unremarkable.  <u>Id.</u>  The MRI showed progression of the left neural foraminal stenosis.  <u>Id.</u>  The final impression was multilevel degenerative spondylosis that is progressed at C4-C5 and C5-C6.  <u>Id.</u>

### c.   The Court's Conclusion

This court finds that the ALJ did not err when choosing not to keep the record open for the MRI after the hearing.  This court finds that the Appeals Council did err when it omitted analysis and discussion of the May 7, 2021, MRI in its decision letter.

The ALJ used appropriate discretion when deciding to close the record at the hearing.  In applying the SSA standard, the ALJ must consider whether the evidence has a direct bearing on the outcome of the hearing; *and* the evidence could not have been obtained before the hearing.  The ALJ asked what body part the MRI would pertain to and was told the "upper back."  Back impairments were included in Mr. B.'s social security claim.  A previous MRI had been submitted into the record, however it was from September 2019, a year and a half before the hearing.  AR354-59.  It was reasonable that the new MRI would have direct bearing on the outcome of the hearing.  However, in response to whether the MRI had yet to be rescheduled, Ms. Mueller reported it had not been rescheduled.  The circumstances of missing the MRI appointment were that Mr. B. had a panic attack.  Yet the missed appointment was over two

weeks prior to the hearing date and no MRI had been scheduled as of the hearing.  The ALJ was under no duty to keep the record open for an unspecified time when Mr. B. had opportunity to get an MRI completed prior to the hearing or at least get it rescheduled.

However, this court finds that the Appeals Council erred when it did not address the May 7, 2021, MRI in its decision letter.  The Eighth Circuit has determined that additional evidence must be reviewed and a determination under 20 C.F.R. § 404.970(a)(5) must be included in the Appeals Council decision if it is unclear to the court whether the evidence was considered.  See Lamp, 531 F.3d at 632; Gartman, 220 F.3d at 922.

The MRI was new, material, related to the period, and there was a reasonable probability that the additional evidence would change the outcome of the decision (as discussed in Step Two and Step Four of this opinion).  The May 7, 2021, MRI contained a new diagnosis of cervical radiculopathy, and noted additional deterioration likely related to Mr. B.'s ongoing pain and limitations.  It was not cumulative to the previous MRI conducted a year and a half prior for this reason.  The MRI had been scheduled to be performed in February prior to the hearing and was conducted less than two months after the ALJ's decision.

The Commissioner concedes that the May 7, 2021, MRI was not mentioned or exhibited in the Appeals Council decision.  Docket No. 15 p. 20-21.  In brief, the Commissioner contends however, that per SSA policy, the MRI was included in the administrative record thus reviewed and determined that it

would not have changed the outcome of the decision.  Id.  This is a post hoc statement.  Such assumptions on what the Appeals Council did or did not consider do not relieve the Appeals Council of their obligations to report determinations to claimants.  The Appeals Council reported on Dr. Tinguely's letter under "Additional Evidence" and exhibited Mr. B.'s letter, both of which made referenced Mr. B.'s MRI.  No mention was made of the MRI.  The MRI is a notable omission.

The Commissioner cites to Van Vickle v. Astrue, 539 F.3d 825, 830-831 (8th Cir. 2008), and Buckner v. Astrue, 646 F.3d 549, 559-560 (8th Cir. 2011), for the proposition that the omission does not require remand.  Id.  These cases are incongruous with the issue presented before this court.  In Van Vickle, the Eighth Circuit found that the ALJ's misread of a hand-written notation was harmless error.  In Buckner, the Eighth Circuit found that the ALJ need not explicitly explain reasons for discrediting third-party statements about the claimant's condition.  Neither case cited by the Commissioner addresses whether the Appeals Council is required to review and report additional evidence received from a claimant.  This court must apply applicable Eighth Circuit case law.

This court finds as to Issue Three, the omission of the MRI in the Appeals Council decision letter resulted in the Commissioner failing to fully and fairly consider the evidence.  Plaintiff's request for reversal is granted and this case is remanded for an evaluation of the May 7, 2021.

**4.     At Step Five, Whether the ALJ Properly Identified Jobs Mr. B. Could Perform.**

Mr. B. asserts that the ALJ failed to show work which existed in significant numbers either in the region where Mr. B. lived or in several regions of the country.  Docket No. 11 p. 21.  Both parties ask this court to adopt a different interpretation of 42 U.S.C. § 423(d)(2)(A).  Mr. B. asks this court to rule similarly as in this district court's recent <u>Benthin</u> and <u>Flatequal</u> decisions that require the Commissioner to present evidence of jobs in the national *and* regional economy.  Docket No. 16 p. 9; <u>Benthin v. Saul,</u> 1:20-CV-01014-CBK, 2021 WL 2982719, at *7 (D.S.D. July 15, 2021).; <u>Flatequal v. Saul</u>, 4:19-CV-04045-VLD, 2019 US Dist WL 4857584, at *26-27 (D.S.D. Oct 2, 2019)  The Commissioner asks this court to apply Eighth Circuit interpretation in which "nationwide" job numbers exceeding 10,000 in number are sufficient for the Commissioner to meet its burden.  <u>Weiler v. Apfel</u>, 179 F.3d 1107, 1111 (8th Cir. 1999); <u>Johnson v. Chater</u>, 108 F.3d 178, 180 (8th Cir. 1997).  Relying on portions of case law that support their respective propositions, both parties neglect to consider the full statutory import of Step Five and the facts specific to this case.

### a.     Applicable Law

Section 423(d) of Title 42 provides in pertinent part as follows:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he

would be hired if he applied for work. ***For purposes of the preceding sentence*** (with respect to any individual), ***"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.***

See 42 U.S.C. § 423(d)(2)(A) (emphasis added).

To adopt the Commissioner's position—a position repeatedly asserted before this court in a number of Social Security appeals—would be to disregard a portion of the statutory language.  The statute states clearly " 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).  "National economy" does not mean "nationally."  Instead, at Step Five, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several other regions" (several parts that, together, consist of something less than the whole nation).  20 C.F.R. § 404.1566.

### b.    The ALJ Decision

Vocational Expert ("VE"), Polly Peterson testified at the ALJ hearing.  AR69.  At the hearing, the ALJ's first hypothetical proposed to the VE was based on Mr. B.'s pre-November 2018 full-range light work RFC.  AR71.  The VE provided national numbers for the following positions: Photocopy machine operator (92,913), order caller (13,006), and cafeteria attendant (29,428).  Id.

The ALJ's second hypothetical was based on Mr. B.'s post-November 2018 reduced-range light work RFC with handling limitations.  Id.  The ALJ

limited the standing and walking time period to four hours of an eight-hour workday for light work.  Id.  The VE mistakenly believed that standing limited to four hours was for sedentary jobs.[19]  AR72.  However, the VE provided several jobs based on the ALJ's criteria which she interpreted as requiring a "sit/stand" option.  Id.  The VE explained that "sit/stand" options would allow an individual to sit and stand at will and that a stool would be provided.  AR74. The number of light work jobs for the second hypothetical with the added "sit/stand" option were cut in half based on the VE's experience.[20]  Id.  Small parts assembler (nationally, 159,622), parking lot attendant (nationally, 16,788) and photocopy machine operator (nationally, 46,456).  Id.

The ALJ's third hypothetical maintained the same post-November 2018 RFC but added that the individual would need an option to alternate sitting for five minutes after every sixty minutes of standing or walking.  AR74-75.  The VE stated there was no change in the type or number of jobs offered for the additional hypothetical limitation.  AR75.  Finally, the ALJ proposed a hypothetical more restrictive than both light work RFCs.  The hypothetical was for sedentary work based on standing/walking for two hours out of an eight-hour workday.  Id.  The VE provided national numbers for the following

---

[19] Sedentary jobs have a stand/walk of two hours per eight-hour workday. Light jobs require "a good deal" of walking or standing. Full range light work is stand/walk six hours per eight-hour workday, but reduced range could be stand/walk four hours per eight-hour workday. SSR 83-10, 1983 WL 31251 *5 (8/20/80).

[20] The VE stated, "the issue of sit/stand option is not in the DOT, and so my answer is based on my education and work experience."  AR76.

68

positions: document preparer (nationally, 19,078), dowel inspector (nationally, 2,423), and addresser (nationally, 2,711).  AR76.  The ALJ asked, "[a]nd regarding your testimony today, you gave several jobs.  Are these jobs available *across several regions,* of the country?"  The VE responded in the affirmative. Id. (emphasis added).

In the ALJ's decision at Step Five, the ALJ determined that based on Mr. B.'s age, education, work experience, and RFCs, there are jobs in that exist in the national economy that Mr. B. could perform.  AR26.  The ALJ cited to both the jobs presented under the first, second, and third hypotheticals which emulated the pre- and post-November 2018 RFCs and limitations.  The total number of these six light work jobs was 358,213, "that exists in significant numbers in the national economy."  AR27.  The ALJ did not cite to the additional 24,212 sedentary work jobs proposed by the VE in its decision.  The ALJ justified the fifty percent reduction in the number of light work jobs presented with a sit/stand option under "SSR 00-4p."[21]  AR27.  The ALJ, relying on the VE's testimony, found that Mr. B. was not disabled.  AR27.

### c.    The Court's Conclusion

The court first rejects the Commissioner's reliance on Johnson v. Chater that because jobs outnumbered 10,000 nationally, its burden was met. While true that most jobs presented were nationally available in Johnson,

---

[21] Before relying on VE evidence to support a disability determination or decision, ALJs must: Identify and obtain a reasonable explanation for any conflicts between VE evidence and the (DOT) and explain in the determination or decision how any conflict that has been identified was resolved. See SSR 00-4p, 2000 WL 1898704 (12/4/00).

importantly, 200 local jobs were also presented.  Johnson, 108 F.3d at 180.
The Commissioner also cites to Weiler v. Apfel for a similar proposition.  In
Weiler, the Eighth Circuit stated that the VE's testimony—that 32,000
surveillance monitor positions were available "nationwide"—was substantial
evidence that there were significant numbers of jobs in the economy.  Weiler,
179 F.3d at 1111.  However, the court in Weiler was addressing whether the
claimant's RFC was supported by substantial evidence and whether that RFC
with other Step Five criteria was properly considered.  Id.  Claimant did not
raise an independent Step Five issue on appeal like the one presented by
Mr. B.  Further, as stated above, "nationwide" is contrary to the statutory
language under 42 U.S.C. § 423(d)(2)(A) that requires consideration of jobs
regionally.

　　　Secondly, this court rejects Mr. B.'s request to remand based on this
district court's previous rulings Benthin and Flatequal.  The facts in the instant
case are distinct from those decisions.  In Flatequal, the VE did not testify to
numbers of jobs existing in Ms. Flatequal's region or in "several regions," only
that a certain number of jobs existed "nationally."  Flatequal, 2019 WL
4857584, at *27.  The Benthin case relied on similar arguments presented in
Flatequal.  In Benthin, the court stated, "the ALJ discussed nothing in the
opinion beyond national numbers and did not even ask the VE about jobs
existing in plaintiff's region or in several regions of the country."  Benthin, 2021
WL 2982719, at *9.

In the present case, the ALJ did ask the VE if the jobs presented in the hypotheticals were available in "several regions."  AR76.

ALJ Question: "And regarding your testimony today, you gave several jobs.  Are these jobs available across several regions, of the country?"

VE Answer: "Yes."

Id.

The ALJ relied on the VE's testimony to determine that there were jobs in the national economy that Mr. B. could perform, which existed in significant numbers across several regions.  AR27; 42 U.S.C. § 423(d)(2)(A).  It is worth noting that the jobs presented by the VE are not uncommon.  As the Commissioner stated in brief, "further inquiry might have been called for had the VE identified uncommon jobs, such as shrimp boat worker or tobacco farmer."  Docket No. 15 p. 29.  Jobs such as small parts assembler, photocopy machine operator, and parking lot attendant, are not limited to specific industries or remote regions of the United States.

Even if this court analyzes Step Five using the ALJ's more restrictive post-November 2018 RFC, this court finds that the ALJ met its burden.  Three common reduced light work jobs were presented:  Small parts assembler (nationally, 159,622), parking lot attendant (nationally, 16,788) and photocopy machine operator (nationally, 46,456).  AR74.  A sit/stand option was available for all three jobs.  Further, although the ALJ did not include sedentary jobs in their decision, given Mr. B.'s more restrictive RFC, he would have been capable of working as a document preparer (nationally, 19,078), dowel inspector

(nationally, 2,423), or addresser (nationally, 2,711).  AR76; 20 C.F.R. § 404.1597(b).  In total, 247,078 reduced light work and sedentary jobs nationally were available, confirmed by the VE that these jobs were available in significant numbers regionally.  Because the ALJ's decision followed the statutory language of 42 U.S.C. § 423(d)(2)(A), and was based on substantial evidence, this court finds no reversal is warranted at Step Five based on the assertion that numbers of regional jobs were not identified.

However, as the court has discussed previously in this opinion, the court is remanding for the ALJ to consider the May 7, 2021, MRI and to re-evaluate whether additional reaching limitations should be incorporated in the Mr. B.'s physical RFC as a result of this additional evidence when considered in light of other evidence in the record.  Because there is a possibility the ALJ may formulate a different physical RFC upon remand, the court also instructs the ALJ in that event to reconsider its step five determination about what jobs are available to Mr. B. in his region or in the several regions of the country.

## E.    Type of Remand

Mr. B. requests reversal of the Commissioner's decision with remand for further development.  See Docket No. 18, p. 21.  For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record as to fully and fairly developing and considering the evidence.  It is unclear whether the Appeals Council considered the additional evidence submitted by Mr. B.  The May 7, 2021, MRI justifies remand for the ALJ to reconsider at Steps Two, Four, and Five in light of the new evidence.

Section 1383(c)(3) of Title 42 of the United States Code provides that final decisions made by the Commissioner of the Social Security Administration as to Title XVI benefits shall be subject to judicial review under 42 U.S.C. § 405(g). "Section 405(g) of Title 42, United States Code, authorizes judicial review of 'any final decision of the Commissioner . . . made after a hearing.' " Efinchuk v. Astrue, 480 F.3d 846, 848 (8th Cir. 2007) (quoting Mason v. Barnhart, 406 F.3d 962, 964 (8th Cir. 2005)). It "authorizes only two types of remand orders: (1) those made pursuant to sentence four, and (2) those made pursuant to sentence six." Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (citing Melkonyan v. Sullivan, 501 U.S. 89, 98-99 (1991)). A sentence four remand "authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.' " Id. (quoting 42 U.S.C. § 405(g)).

"A sentence four remand is therefore proper whenever the district court makes a substantive ruling regarding the correctness of a decision of the Commissioner and remands the case in accordance with such a ruling." Id. A sentence six remand is authorized "in only two limited situations: (1) where the Commissioner requests a remand before answering the complaint . . . or (2) where the new and material evidence is adduced that was for good cause not presented during the administrative proceedings." Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record 'overwhelmingly

supports' such a finding." Id. at 1011 (quoting Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992)).  "[W]hen a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of 'our abundant deference to the ALJ,' remand the case for further administrative proceedings." Id. (quoting Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998)).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be supplemented, clarified, and/or properly evaluated under the applicable law.  See also Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) ("an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability").  Therefore, a remand for further administrative proceedings so the ALJ can address these issues is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby:

ORDERED that that plaintiff's motion to reverse [Docket No. 10] is granted. Defendant's motion to affirm [Docket No. 14] is denied.


DATED this 26 day of October, 2022.

BY THE COURT:


_____
VERONICA L. DUFFY
United States Magistrate Judge